**ORIGINAL**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____22-CV-02843- MDB-WJM_____

(To be supplied by the court)

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 20 2024

JEFFREY P. COLWELL
CLERK

_RALPH MARCUS HARDY,_____, Plaintiff

v.

~~Jury Trial requested~~
(Please check one)
__X__ Yes ____ No

_ADAMS COUNTY, a Municipality_____,

RICHARD REIGENBORN, in his individual capacity,

DENNIS RABIE, a deputy,_____,

_DEPUTY DEHERRERA, a detention specialist_____, Defendant(s).

(*List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.*)

---

## THIRD AMENDED
## PRISONER COMPLAINT

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

Original form provided free of charge by CO DOC Legal Services to
Offender Hardy_____ DOC# 110262
Date JUN 0 5 2024

## A.   PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

Ralph Marcus Hardy, Registration Number 110262 -Trinidad Correctional Facility
   (Name, prisoner identification number, and complete mailing address)

21000 HWY 350 East, Model, CO 81059
   (Other names by which you have been known)

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

  X    Pretrial detainee
_____   Civilly committed detainee
_____   Immigration detainee
_____   Convicted and sentenced state prisoner
_____   Convicted and sentenced federal prisoner
_____   Other: (*Please explain*) _____

## B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint.  If more space is needed, use extra paper to provide the information requested.  The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1:   Adams County is a Municipality in the State of Colorado
               (Name, job title, and complete mailing address)

               4430 South Adams County Pkwy. 5th Floor, Suite C5000B Brighton CO 80601

               At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?    x   Yes _____ No (*check one*).  Briefly explain:

                Adams County owns and operates the Adams County Detention Facility

                And the Adams County Sheriff's Office

               Defendant 1 is being sued in his/her _____ individual and/or  x   official capacity.

Original form provided free of Charge by CO DOC Legal Services to
Offender Hardy                              DOC# 110262
Date   JUN 0 5 2024

Defendant 2:   Richard Reigenborn was the Elected Sheriff of Adams County Colorado
           (Name, job title, and complete mailing address)

           4430 South Adams County Pkwy. 5th Floor, Suite C5000B Brighton, CO 80601

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _x_ Yes ___ No (*check one*). Briefly explain:

   Richard Reigenborn was a final policy maker for Adams County, the

   Adams County Detention Facility and the Adams County Sheriff's Office

Defendant 2 is being sued in his/her _x_ individual and/or ~~x~~ official capacity.

Defendant 3:   Dennis Rabie is an Adams County Deputy Sheriff
           (Name, job title, and complete mailing address)

           501 N 19th Ave. Brighton, CO 80601

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  _X_ Yes ___ No (*check one*). Briefly explain:

   Deputy Rabie was acting as a Municipal Employee for the Adams County

   Sheriff's Office.

Defendant 3 is being sued in his/her _x_ individual and/or ___ official capacity.

Please see attached page for one additional defendant*

C.        JURISDICTION
*Indicate the federal legal basis for your claim(s): (check all that apply)*

 _X_    State/Local Official (42 U.S.C. § 1983)

____    Federal Official
       As to the federal official, are you seeking:
       ___ Money damages pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)
       ___ Declaratory/Injunctive relief pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1361, or 28 U.S.C. § 2201

____    Other: (*please identify*) _____

Original form provided free of Charge by CO DOC Legal Services to
Offender Hardy_____ DOC# 110262
Date JUN 0 5 2024

B.  Additional Defendants

Defendant 4: Deputy DeHerrera is an Adams County Detention Specialist

501 N. 19th Ave. Brighton, CO 80601

Defendant DeHerrera was acting under the Color of Law as an Adams

County Deputy Sheriff, and is being sued in his individual capacity.

D. Statement of Claims (continued on following pages)

Please see attached pages for the claims raised and the facts in support thereof.

Original form provided free of Charge by CO DOC Legal Services to

Offender Hardy                    DOC# 110262

Date JUN 0 5 2024

D. Statement of Claims

Claim One - 1983 Fourteenth Amendment Claim for Relief against Adams County, Richard Reigenborn and two unknown masked Adams County Deputies for failure to protect Plaintiff Ralph Hardy (Mr. Hardy) from a known or obvious risk of harm, and the use of excessive force against his person by the two unknown masked Adams County Deputies.

Facts as to Claim One:

1. At all times relevant to the claims giving rise to this prisoner complaint, Mr. Hardy was booked into the Adams County Detention Facility ("ACDF") on October 6, 2021, which is owned and operated by the Municipality, Adams County. Mr. Hardy was booked for pre-trial matters and remained there for the entire time relevant to the claims made herein.

2. Defendant Richard Reigenborn was the elected Adams County Sheriff. All official capacity claims made herein against defendant Reigenborn should be considered as claims against Adams County, the Municipality, and will be labled as such.

4.

3.   As the Municipal Sheriff, defendant Reigenborn was a final policy maker for Adams County, and is defined in the Colorado Constitution as a "County Officer". Defendant Reigenborn is also defined as the actual or Constructive Supervising authority for the ACDF and the Adams County Sheriff's office ("ACSO"); and he is the final policy maker for those two municipally owned agencies.

4. Defendant Reigenborn is personally responsible for hiring, training, supervising and the discipline of all employees working in the ACDF and the ACSO, as well as those operating as Court Services personnel in the Adams County Courthouse; and as relevant here, the Adams County Courtroom that was established by Adams County, inside the ACDF, and was being used by Adams County as a virtual Courtroom for the Municipalities Criminal Court Docket. Adams County was responsible

4 (a)

for the operations of its municipal courtrooms, subject to Judicial or Administrative policies customs or practices, as outlined by the Judges of the 17th Judicial District and the Chief Judges thereof.

5. One such Municipal and Administrative policy, Custom or practice, was the restricted use of Camera's, Cell phones, recording devices, or any equipment that can be used as a Camera or recording device or live video feed, inside Adams County Courtrooms. Any such violation of this policy, Custom or practice, by any person, including law enforcement or Court Services personnel, is subject to incarceration for Contempt, and is thus a violation of Clearly established law.

6. When Mr. blandy arrived at the ACDF on October 6, 2021, Adams County Courthouses were closed and Jury Trials were under suspension by Administrative order. Courthouse Closures and Jury Trial Suspensions were in response to the COVID-19 Virus.

7.   In this Case, Adams County adopted a Customary practice of Complacency, which Caused the Municipality to be completely unprepared for the COVID-19 Pandemic. Despite actual or Constructive notice by our Country's evolutionary history in dealing with these type Contagions, Adams County simply became deliberately indifferent to the Known or obvious risk of harm that a perpetual enemy such as COVID would pose. Adams County also acted deliberately indifferent to a need for better policies, Customs or practices to protect the inmates being detained in its Municipal Detention Facility. The fact that Adams County lacked policy, Customs or practices to protect its Criminal Justice Operations, or the detained inmates in its Jurisdiction, Spawned a Series of policies, Customs or practices that Adams County and defendant Reigenborn knew or reasonably should have known violated Clearly established law, and Caused Constitutional harm. Because of

4(c)

Courthouse closures and the suspension of jury trials, Adams County's Criminal justice process was in peril. Social distancing requirements for the protection of the public and Criminal justice employees, also brought additional Challenges to Adams County's Criminal justice operations.

8. In response to these municipal conundrums, Adams County turned to its elected Sheriff, Richard Reigenborn. As a final policymaker for Adams County, Mr. Reigenborn was empowered with the authority to Change, promulgate, Create, implement or possess responsibility for the Continued operation of municipal policies, Customs or practices that would ensure a Constitutionally efficient Criminal Justice Process, in the wake of the COVID pandemic.

9. One of the policies that Adams County adopted, and approved, was a Social distancing protocol which was designed by Mr. Reigenborn, Strictly limiting contact

4(d)

between Adams County inmates, pubic defenders and Sheriff's investigators. Adams County Detention Officers, who were already exposed, by daily inmate contact, and who were most likely vaccinated by COVID protocols, took on the additional role of criminal investigators. Adams County adopted and approved a policy, custom or practice of allowing Adams County Deputies to use cell phones inside the Adams County Virtual Courtroom during court proceedings, which included privileged communications between court appointed counsel and their inmate clients. The use of these recording and video devices were so blatantly obvious that privately retained counsel's refused to engage virtually in privileged communication with their inmate clients. Most, if not all of the Adams County inmates were oblivious to Adams County Law Enforcement monitoring their privileged communications, because they were lulled by the fact that their own attorney's

4 (e)

were the ones engaging the communication. It was later discovered, and revealed by an Adams County Detention Officer, that Adams County Law Enforcement were under orders to monitor attorney-client communications, and that this act was authorized by Adams County Public Defenders, to avoid their own personal contact at the jail, with Adams County inmates. Despite those particular facts and matters, Adams County knew, by actual or constructive notice, that monitoring and/or recording privileged communication between an attorney and a client, without the specific authorization and waiver by the client, exclusively, is a violation of clearly established law.

10. These acts or omissions were authorized by Adams County, in its efforts to keep the Adams County Criminal Court Docket moving. Specifically, Adams County law Enforcement would gather incriminating facts and information directly from the mouths of the accused

4 (F)

during the virtual attorney-client meeting. The information unlawfully obtained would be handed over to Adams County Criminal Investigators by the detention officers, which would then be submitted to the Adams County District Attorney's Office for sifting. The admissability of the information was irrelevant, because jury trials were under suspension. The information was only being used to induce guilty pleas. The unlawfully obtained information would then be cloaked by jury trial waivers and Rule 11 advisement proceedings.

11. Mr. Hardy's attempts to redress this unlawful and unconstitutional objective made Mr. Hardy an instant target for retaliatory acts or omissions by both, the municipality and the Agency's headed by Richard Reigenborn. Not only did Mr. Hardy seek redress through the inmate grievance process, he began to spread this unlawful behavior throughout the ACDF, which triggered Adams County inmates to refuse speaking about their cases in front of law

4 (s)

enforcement, which brought the Adams County Criminal Justice operations for detained inmates, back to its original stalled condition

12. In an effort to continue its unlawful and unconstitutional objective, Adams County took a strategic combative posture to the inmate refusals by adopting and approving a "use of force" policy, custom or practice that was intended to compel the inmate population to give up their attorney-client privilege, and their right to remain silent"

13. Multiple 1983 Prisoner Complaints were filed in this court by individual inmates claiming that Adams County Deputies were using force as a means to compel them to give up their right to remain silent. This

---

1. The use of force, by any government entity, to compel a criminal defendant to relinquish any right, privilege or immunity is a violation of clearly established law.

4 (h)

was a persistent practice by Adams County Law

Enforcement, and was executed with the force of law.

14. Mr. Hardy was scheduled for a Boulder

District Court appearance on October 26, 2021, by

virtual means, from the ACDF. Mr. Hardy was escorted

to an A-Module Conference room by deputy Jones, who

seated Mr. Hardy in front of a laptop with no head-

phones. Deputy Jones seated herself at the end of the

table, approximately 3 to 4 feet away and extracted

a cell phone from her top shirt pocket. Mr. Hardy's

court session began as an attorney-client "breakout"

session between Mr. Hardy and his Boulder County

Public Defender, Samuel Dunn. Deputy Jones then

began to act as if she were video recording Mr. Hardy's

attorney-client conversation. Mr. Hardy immediately

ended his conversation and informed Mr. Dunn that

Adams County law enforcement in the room with him

~~and~~ was attempting to monitor their communication.

4 (i)

At that point, Adams County's policy, custom or practice violated Mr. Hardy's clearly established right to counsel, because he was unable to communicate with his attorney in private during a critical stage of the criminal process. (Advisement.)

15.   When the Boulder Judge came to the virtual screen, Mr. Hardy made an immediate objection to Adam County law enforcements unlawful breach to his attorney-client privilege. The judge acknowledged Mr. Hardy's objection and informed Mr. Hardy that he had a right by rule and the Constitution to have private communication with his attorney. Mr. Hardy turned the laptop camera in the direction of the Adams County Deputy who was caught off guard by the judge with cell phone in hand, pointing it in Mr. Hardy's direction. The deputy then leaped from her position to close the laptop lid, and unnecessarily called for First Responders, because Mr. Hardy neither spoke or moved from his quietly seated position. When the two unknown

4 (J)

masked Adams County Deputies entered the room, as first responders, they seemed somewhat confused, because Mr. Hardy was still seated quietly in his chair, and posed no risk of threat to the safety and well-being of himself or the authorities. A brief communication ensued between the First Responders and the deputy who called them.

16. Without threat or provocation, but in accordance with Adams County's "use of force" policy, custom or practice, to compel inmates to give up their attorney-client privilege and their clearly established rights to remain silent, the two unknown masked deputies acted deliberately indifferent to clearly established law and viciously assaulted Mr. Hardy, causing serious bodily injury. The excessive force used by the Adams County Deputies ruptured a previous Anterior Cruciate Ligament repair in Mr. Hardy's right knee, which now requires a full knee replacement to repair. As a result

4(κ)

of the knee injury, Mr. Hardy is now unable to safely climb the ladder on his Concrete Mixer Truck to slump the Concrete or to Clean the barrel of the Mixer once the Concrete is expelled. This will result in Lost Gross wages for Mr. Hardy in an amount of $95,000 - $110,000 dollars per year, from the date of his release from incarceration. That Clock should begin to tick within the next 180 days, and will Continue until Mr. Hardy receives a complete knee replacement as a result of his injuries

17. In addition to Mr. Hardy's knee injury, Mr. Hardy Suffered a brutal Cut to his right wrist from the inhumane and improper application of handcuffs. The injury was so egregious that tendon and bone Could be seen inside the wound.

18. The blunt force trauma to Mr. Hardy's back and kidney area Caused internal bleeding from Mr. Hardy's urinary tract. Mr. Hardy has been bleeding from his urinary tract for over 31 months as a result of an

4 (L)

unlawful delay in medical care. Mr. Hardy believes that the CDOC has refused to pay for something that is believed to be the responsibility of Adams County. Adams County has simply remained deliberately indifferent to Mr. Hardy serious medical needs by not putting a medical hold on him to follow-up with the Denver Urologist who ordered the follow-up, because he has still not yet determined where Mr. Hardy is bleeding from. During his original examination, to try and locate the source of the bleeding, the Urologist found a bladder tumor. The removal of the tumor did not cure Mr. Hardy's bleeding, which led the urologist to believe that the blunt force trauma from the two deputies was the cause of the bleeding. The Urologist ordered a follow-up to continue looking for the source of the bleeding, which Adams County failed to schedule, and has now allowed Mr. Hardy's medical condition to go without treatment for 31 months, which has now dibilitated to incontenence.

4(m)

Adams County's intentional trickery to get the CDOC to pay for a Medical Condition that their unlawful policy Custom or practice Caused has resulted in Mr. Hardy being trapped in a medical limbo, and still bleeding. The CDOC is now trying to have Mr. Hardy placed in a Community Corrections Setting, to Shift the Cost burden to Mr. Hardy's insurance, but it is Adams County who remains liable, because of the excessive use of force, attributed to the unlawful assault on Mr. Hardy's person, by the two unknown masked deputies.

19. Mr. Hardy's verbal request for medical attention, to the two deputies fell on deaf ears. Mr. Hardy was unable to walk due to the swelling in his knee. The deputies carried Mr. Hardy by his handcuffs, with one of the deputies stating, "he's bleeding all over my Cuffs". Mr. Hardy's Second request to See medical was met with the statement "you'll heal". Mr. Hardy was not permitted to See medical for his injuries until he had healed.

4 (N)

20. It was at that point that Mr. Hardy realized that defendant Reigenborn had personally trained his subordinate deputies to avoid civil and/or criminal liability by denying or delaying medical care for the inmates they intentionally harmed, to prevent medical documentation of those unlawful injuries. An act of deliberate indifference to medical care.

21. Because these acts or omissions were done under the approval and directions of defendant Reigenborn, any reporting of these unlawful acts or omissions to other Adams County Detention Facility staff was a moot point, because it was clear to all Adams County Deputies, that these acts or omissions were guided, directed and approved by defendant Reigenborn, and as the final policy maker for the ACSO and the ACDF, his decisions, policies, customs or practices were not up for debate; they were to be carried out, without question, which his subordinate

4(c)

deputies did, despite the egregious and unlawful nature of the hand that guided them.

22. Not only was Adams County deliberately indifferent to a need for better policy, customs or practices to ensure that its criminal justice operations ran with dignity and constitutional equity during the cycle of a knowingly coming perpetual contagion, Adams County acted deliberately indifferent to the known or obvious consequences that would arise for their acts, or failures to act. In this case, Adams County placed a rogue Sheriff[2] at the helm of its virtual criminal justice operations in the ACDF, that resulted in an array of unlawful municipal and agency policies, customs, or practices; and a violent arrogation of Mr. Hardy's Fourteenth Amendment guarantees, that left Mr. Hardy permanently injured and bleeding internally, for over 31 months.

---

2. Defendant Reigenborn was arrested and convicted of falsifying his qualification to the Adams County electorate, to run for Sheriff.

23. Not only did Adams County fail to protect Mr. Hardy from the unlawful and egregious acts of the two unknown deputies, it was the municipal policies, customs or practices put in place and adopted by its municipal sheriff that directly caused the constitutional harm, in an effort to force an unlawful and unconstitutional objective, for Adams County's benefit.

24. Defendant Reigenborn was personally responsible for the unconstitutional and intolerable conditions of confinement in the Adams County Detention Facility. Although he was personally responsible for the training, supervision and discipline of his subordinate deputies, he had no viable ability to complete the responsibility, because he falsified his own training; and was constitutionally deliberately indifferent to the known or obvious consequences of trying to produce good fruit from a poisonous tree.

4 (a)

25. Defendant Reigenborn literally fostered a culture of deliberate indifference to the bodily safety and well being of the inmates detained in the Adams County Detention Facility, by adopting and approving a municipal "use of force" policy, custom or practice, for the purpose of abrogating the rights, privileges or immunities of the inmates in his care.

26. Defendant Reigenborn sowed the seeds of discomposure, and was deliberately indifferent to his statutory obligation to keep the ACDF clean, safe, and wholesome. He directed his subordinate deputies to defy the law, by preventing medical documentation of the injuries that his policies, customs or practices produced, in an unlawful effort to prevent any type remedy for those that his policies, customs or practices intentionally harmed.

4(r)

D. Statement of Claims

Claim Two; Fourteenth Amendment Claim for Relief Against Adams County, Richard Reigenborn, Daniel DeHerrera and Dennis Rabie for deliberate indifference to Mr. Hardy's Serious Medical Needs.

Claim Four: First Amendment Claim for Relief Against Adams County and Richard Reigenborn for acts of retaliation against Mr. Hardy for seeking Redress in this Court for injury.[2]

Adams County and Richard Reigenborn. (Retaliation)

27. In this case Mr. Hardy was confined to a wheel-chair for the things complained of in claim one. Prior to the filing of Hardy v. Ring it was both municipal and ACDF policy custom or practice, to house disabled inmates who required special accommodations to be housed in an ADA compliant Living unit, which in this case was F-2100-Block.

_____

2. Because the events, facts and matters in Claim Two transpired after the events, facts and matters in Claim Four, Mr. Hardy has elected to consolidate the facts from both claims as a chronological pleading. However, Mr. Hardy will isolate Defendants DeHerrera and Rabie from the retaliation claims in claim four, because there is no evidence that their acts or omissions were retaliatory in nature.

4(s)

28.  Pursuant to the current policy, custom or practice, Mr. Klundy qualified for ADA housing, and was provided, and housed for such. During Mr. Klundy's stay in F-Block he rallied the inmates together and promoted a safe, unified legal challenge to Adams County's and Richard Reigenborn's unlawful criminal justice operations. This inmate stand brought forth Adams County Deputy "Beach" who came into the housing unit and stated that all court appointed attorney's had covertly waived the attorney client privilege for their clients, to allow the criminal justice operations to continue to move, in exchange for not having to make personal contact with the inmates at the jail.[3.]

---

3. This, among other things is what exposed the 6 headed serpent. Specifically, Adams County; Reigenborn; The Office of the Public Defender; Office of the Alternate Defense Counsel; The Office of the District Attorney; and some, if not all of the Judges of the 17th Judicial District.

4 (+)

29. Even prior to the filing of Hardy v Ring in this Court, the rumors of it sparked fear and personal concerns for the parties who were involved in the creation of an unlawful Criminal Justice operation. Specifically, the participants involved all faced some type disciplinary action upon discovery of their unlawful acts or omissions. Moreover, their acts or omissions created a 'structural defect' in the Criminal Cases where the inmate was represented by Court appointed Counsel, because of Counsels Contributory act of violating their own Clients Constitutional rights. Every plea and Conviction entered during the covid shutdown, against any Criminal defendant who was represented by Court appointed Counsel would be Considered Constitutionally void as a result of Conflict between Court appointed Counsel and the inmate they represented at plea and Sentencing. The guilty parties feared what this Court may do in a Situation where a municipality Created Something

4(u)

that they knew violated the Constitutional rights of every inmate represented by court appointed counsel.

30. In an attempt to prevent Mr. Hardy from exercising his First Amendment right to freedom of speach, and to access the Courts for injury, Adams County dispatched its municipal Sheriff to thwart Mr. Hardy's attempt at redress. In turn, defendant Reigenborn sent Sgt. Europe and two unknown Adams County Detectives, as muscle, to warn Mr. Hardy not to file his lawsuit, and if he did, his future at the ACDF would be even less comfortable than the normal discomforts of jail.

31. Private Attorney Joe Saintveltri and ADC Counsel Martha Eskesen withdrew from their representation of Paul Graham, Adams County Case Numbers: 21-CR-776 and 21-CR-3548 and agreed to become witnesses against Adams County; the Sheriff; the Offices of the Public Defender; and Alternate Defense

4(v)

Counsel; and testify to 28 specific violations of their clients confidentiality rights, as a result of Adams County's unlawful Criminal Justice Operations. This sparked the elected Public Defender[4]; and Lindy Frolic, head of the ADC to make an attempt at damage Control. Multiple appointed attorney's had been discharged by 17th Judicial District Judges following "in Camera" (Bergerud) hearings. Specifically, inmates moved to discharge their attorney's on the grounds that the attorney's Created a Conflict of interest in the attorney-Client relationship by allowing law enforcement to monitor attorney-client Communication inside the virtual Courtroom, in violation of the Colorado Rules of Professional Conduct.[5]

    32. The damage Control attempted by Public Defender, Megan Ring and ADC Director Lindy Frolic

---

4. Megan Ring
5. These were motions Mr. blady encouraged the inmates to file.

was the reinstatement of attorney's back to Criminal Cases they had been removed from during an "in Camera" hearing. Megan Ring and Lindy Frolic actually put their attorney's back on Criminal Cases they had been removed from for conflict in the attorney-client relationship. Lindy Frolic reappointed ADC Counsel Martha Eskesen back to the "Graham" Case that she was granted leave to withdraw from for Ethical reasons. In Ms Frolics brief to the Court, to request the order of reinstatement of the ADC attorney, was information that was from a Sealed record from a "Bergerud" hearing She was not legally allowed to have, and could only have obtained the information from the Honorable Jeffrey A. Smith in the 17th Judicial District. It became clear that Judge Smith was advocating "ex parte" with both ADC Director Lindy Frolic and Public Defender Megan Ring in this attempt at damage Control.

4(x)

33. Despite the attempts by Adams County and Richard Reigenborn to impede Mr. Hardy's clearly established constitutional rights under the First Amendment to freedom of speech and his right to seek redress in this Court for injury, caused by an unconstitutional municipal Criminal Justice operation that Adams County created, despite actual or constructive notice that the act of monitoring attorney-client communication was a violation of clearly established law, even in the time of a pandemic

34. In response, and by acts of retaliation, Adams County changed and adopted new municipal policies, customs or practices regarding its only ADA Compliant Living Unit for medium custody inmates who are disabled. This policy, custom or practice was changed immediately following Mr. Hardy's filing of Hardy v Ring. This policy change resulted in Mr. Hardy

4(Y)

being intentionally moved from the safety of the ADA equipped living unit into an environment that presented a known or obvious risk of harm, which Adams County and defendant Reigenborn consciously and deliberately disregarded in an attempt to punish Mr. blardy for filing blardy v Ring.

35. In an unreasonable show of force, armed Adams County Deputies, dressed in full riot gear, immediately following Mr. blardy's court filing, singled Mr. blardy out and isolated him from the other inmates he was assisting with their own personal Civil Rights Claims. Mr. blardy was advised of a municipal and agency policy change that no longer allowed his status as an American with a Disability to remain in the ADA Compliant living unit, which mandated that Mr. blardy be placed in a living unit that posed a known or obvious risk of harm to Mr. blardy's bodily safety and well-being, which ultimately caused Mr. blardy's

4 (2)

September 22, 2022 fall, which was caused by Adams County's deliberate indifference to Mr. Hardy's disability needs. Knowing the risk of harm Mr. Hardy faced, Adams County could have prevented Mr. Hardy's fall by simply installing a handrail, or moving Mr. Hardy to the cell next to his which already had a handrail installed. Mr. Hardy's move request was denied and he was told it would take months to have a handrail put in his cell.

36. It was the intent of Adams County and defendant Reigenborn to cause personal injury to Mr. Hardy in an act of retaliation, by putting him in a known risk of harm, and then, consciously or deliberately withholding the accommodations that would have made it safe to shower or use the toilet in his cell. Despite actual or constructive notice by clearly established law and requests by Mr. Hardy to be provided ADA

4 (a-2)

accommodations for nearly 3 months. Adams County and Richard Reigenborn acted deliberately indifferent to the known or obvious Consequences of their acts or failure to act, knowing that their acts or omissions would result in Constitutional harm.

37. Adams County used its Municipal Law Enforcement Agency as a totalitarian henchman to protect and Continue down a path of unlawful behavior, and to impose its will upon the inmates housed in its Municipal Detention Facility, including Mr. Hardy.

38. It was Adams County's legal duty to protect Mr. Hardy from any known risk of harm. However, Adams County and defendant Reigenborn were the direct cause of the harm Mr. Hardy faced as a wheelchair bound inmate, and then tried to provide him with unrealistic items to use as an accommodation, and only after he fell, such as a plastic Chair to sin in while

4(b-2)

showering, but without a way to overcome the 8 to 10 inch barrier that prevented him wheelchair access to the shower. The second thing Mr. Hardy was provided was a lid to one of the inmate gray storage boxes, as an eating and writing table.

39. Adams County was simply deliberately indifferent to a need for actual alternate ADA accommodations because they did not own any, despite actual or constructive notice that the failure to provide disabled inmates in its Detention Facility with alternate accommodations in the non-ADA living units, would result in Constitutional harm, as it did in this case.

Adams County, Reigenborn, Rabie and DeHerrera, Deliberate indifference to Mr. Hardy's serious Medical Needs. (Claim Two)

40. Mr. Hardy hereby adopts and incorporates all facts and matters pled in paragraphs 1 through 39 as if factually set-forth and alleged herein.

4 (c-2)

41. The Adams County Detention Facility's Construction began in 1986. The approved Construction plans specifically Called for the installation of an in-cell intercom System that was adopted and approved by Adams County as an emergency response System. The Specific intent and purpose of the in-cell intercom System, was to provide an inmate, locked in his or her cell, a means to alert the Jail Staff of a need for emergency medical care. According to the Jails orientation protocols, and an inmate training video that is played Monday through Friday at 11:00 A.M. in repetative Cycles, the button inside the cell is for emergency purposes only, and dictates that upon activation, Staff will respond to your medical emergency in Seconds. Thus, it is safe to Say that Jail Detention Staff are under actual or Constructive notice, that when an inmate activates his or her

4 (d-z)

in-cell emergency distress button, the inmate is specifically calling for, and alerting staff to a medical emergency. Prior to defendant Reigenborn's tenure as the Municipal Sheriff, it was municipal policy, custom or practice to train its Detention Facility Staff, to know and understand, that any intentional disregard for the alert that transmits from the inmates locked cell when his or her emergency distress button is activated, may result in an unconstitutional delay or denial of the inmates clearly established right to medical care. Moreover, Detention Facility Staff was trained to know, and understand, that disregard for the activation of an inmates emergency distress button may result in further injury or even death to the inmate, and the probability of this result was extremely high.

42. When Defendant Reigenborn took office and became a final policy maker for Adams County

4 (e-z)

he repudiated the need for this type of training, despite the very high probability, that a medically distressed inmate would be deprived of needed medical care, in violation of clearly established law. While the change in the policy custom or practice does not require the proof of deliberate indifference, the failure to train ACDF staff of a need to immediately respond to an inmates emergency response button is an act of deliberate indifference to the known or obvious consequences of the act or failure to act.

43. As a result of defendant Reigenborn's retalitory acts and Adams County's change in policy, custom or practice, that prevented Mr. Blandy from living in an ADA compliant living unit, Mr. Blandy was intentionally placed in a living unit that was a known or obvious risk to his personal safety and well-being while confined to a wheelchair.

4 (f-2)

Adams County's deliberate indifference to the known or obvious consequences of not owning or providing alternate accommodations to fit Mr. Hardy's disability needs resulted in Mr. Hardy falling to the floor of his locked cell in an attempt to make the unsafe wheelchair/toilet transfer.[6]

44. Mr. Hardy's repeated requests and complaints to the living unit corrections staff was actual or constructive notice that Mr. Hardy was at a risk of personal harm any time he attempted to use the shower, or the toilet inside his cell. Because staff was aware of the known or obvious risk of harm Mr. Hardy faced, and the fact that Mr. Hardy had absolutely no history of activating his emergency distress button, would cause any reasonable person to think, that if Mr. Hardy's

---

6. Mr. Hardy was not provided any alternate accommodations to assist him with using the shower, toilet or writing table until after his September 22, 2022 fall, despite nearly 3 months of requests for alternate accommodations.

4(9-2)

emergency distress button were activated, it would in fact, be a genuine medical emergency that would require immediate attention.

Defendant DeHerrera

45. On September 22, 2022 when Mr. Hardy fell he was instantly immobilized, and in extreme pain in his back. Mr. Hardy's condition and injury was so plainly obvious that it actually frightened Mr. Hardy's cell-mate, to the point that he immediately leaped from the top bunk and activated the emergency distress button. The living unit was in a lockdown status and there was no other way to alert staff of Mr. Hardy's medical emergency. The pain Mr. Hardy was experiencing and his inability to move caused Mr. Hardy to urinate on himself. Mr. Jose Herrera Martinez #22-7749 waited approximately 10-15 minutes before activating the emergency distress button a second time. After another 10-15 minute

4 (h-2)

wait, Mr. Martinez activated the emergency distress button a third time. Mr. Hardy remained immobilized in the floor of his cell in extreme pain and soaked by his own urine for over 45 minutes, waiting for a response from jail staff, to no avail. Mr. Hardy cell-mate became so concerned and overwhelmed by the event that he tried to render some type of assistance to Mr. Hardy, but only ended up causing further injury and pain to an already serious injury

46. Defendant Daniel DeHerrera was the Deputy "detention specialist" assigned to the Module Tower, that received the emergency distress signal from Mr. Hardy's cell on the date of his fall. It was Mr. DeHerrera's duty to respond to the distress signal, assess the situation, and then respond accordingly. Mr. Hardy had prior verbal communication with Mr. DeHerrera, where Mr. Hardy had voiced his

4(i-2)

Complaints about his personal safety when trying to access the living unit shower or the toilet inside his cell. Mr. Detterrera would tell Mr. blardy to voice his complaints to the ADA Coordinator, Jennifer Overmyer. Despite Mr. Detterrera's attempts at leading Mr. blardy down a path for resolution, Mr. blardy's verbal complaints to Mr. Detterrera were still actual or constructive notices of the risks of harm Mr. blardy faced when trying to shower or use his toilet. Given the fact that the living unit was in a lockdown status, and Mr. blardy had no prior history of activating his distress button, along with Mr. Detterrera's knowledge that Mr. blardy's personal safety was at risk in his own cell when trying to use the toilet, it is clear that any person of reasonable understanding would know that Mr. blardy was calling for help, when his distress button was activated three consecutive times. In retrospect, Mr. Detterrera was a "gatekeeper", the only

4 (j-z)

path to pain relief and treatment for a medical emergency; and he consciously or deliberately chose to ignore the highest probability, than not, that Mr. Hardy was in need of emergency medical attention. Defendant DeHerrera acted deliberately indifferent to Mr. Hardy's call for emergency medical attention, that resulted in Mr. Hardy being further injured by his cell-mate; unnecessary pain and suffering, and laying in his own urine for nearly 90 minutes, in toto.[7]

47. Mr. Hardy's cell mate finally managed to assist him with a change of clothes and getting him back into his wheelchair. Mr. Hardy's pain was still at extreme levels, he was contorted and displayed every known visual sign that he was in need of emergency medical attention.

---

7. These acts or omissions subjected Mr. Hardy to Cruel and unusual punishment pursuant to the Fourteenth Amendment to the United States Constitution.

4 (K-2)

Dennis Rabie

48. Although there was never an actual response to Mr. blandy's medical distress button, Defendant Dennis Rabie entered the living unit to pass out the last meal of the day. It was approx. an hour, to an hour and a half before Mr. Rabie would change shifts, and leave the facility for the evening.

49. When Mr. Rabie opened Mr. blandy's cell door to pass in the evening meal, he took one look at Mr. blandy and asked him what was wrong with him. This indicates that Mr. Rabie could visually see Mr. blandy's distress and his obvious need for medical attention. In response to Mr. Rabies question, Mr. blandy verbally declared a medical emergency and explained how and why he was hurt. When Mr. blandy made the actual statement that he fell in an attempt to make a wheelchair/toilet transfer

4 (L-2)

without an accommodation, Defendant Rabie simply closed the cell door in Mr. blardy's face while stating "file a grievance". This act or omission by defendant Rabie was an intentional and blatant disregard for Mr blardy Constitutional right to medical care. Defendant Rabie had both visual and verbal confirmation that Mr. blardy was in medical distress. Even Mr. blardy's cell-mate chimed in and told defendant Rabie that he thought he'd injured Mr. blardy further when he was trying to help him up off the floor. Not only did defendant Rabie intentionally disregard Mr. blardy's verbal declaration of a medical emergency, defendant Rabie disregarded Mr. Martinez' verbal confirmation that he had accidently hurt Mr. blardy while trying to help him. This act of deliberate indifference left Mr. blardy locked behind a steel door, in extreme pain and suffering until the next

4 (m-z)

Shift. Not only did defendant Rabie act deliberately indifferent to Mr. Hardy's serious medical condition, he also acted deliberately indifferent to the need of reporting Mr. Hardy's declaration of a medical emergency to the next Shift, so that the new Shift could assist Mr. Hardy with his medical distress. Deputy Rabie simply left the facility at his normal change of shift hours, disregarding Mr. Hardy's pain and suffering.

50. Mr. Hardy remained in extreme pain and suffered in a medical emergency situation for nearly four continuous hours, from the time of the initial activation of his emergency distress button until his next contact with Detention Facility Staff.

51. Mr. Hardy's next contact with staff was during the evening medication pass. Deputy Chavez was the jail staff escorting "Nurse Doreen" with the

4 (N-2)

medical Cart. When Mr. Hardy's Cell was opened Mr. Hardy was pushed out of his Cell in his wheelchair by Mr. Martinez, as Mr. Hardy was not able to operate the wheelchair on his own due to the pain and discomfort of trying to move his arms. For a Second time it only took one visual observation of Mr. Hardy's demeanor, obvious pain, and Contorted position in his wheelchair to trigger a mental understanding that Mr. Hardy was in medical distress. The First was defendant Rabie, and the Second was nurse Doreen. When She Saw Mr. Hardy, her immediate reaction was the Same as defendant Rabie's, She asked: "What happened to you"? Mr. Hardy again asked to See a doctor, and declared a Medical emergency. Mr. Hardy verbally explained how and why he was injured, how he had laid in the Floor of his cell for over an hour and a half with no response from the Control Tower, to his emergency distress button.

4 (0-2)

Mr. Hardy explained how defendant Rabie completely disregarded Mr. Hardy's visual and verbal need for medical attention, closing the cell door in Mr. Hardy's face while telling him to "file a grievance." Then, when Mr. Hardy filed a grievance regarding defendant Rabie's acts or omissions, he headed the grievance off before it could make it to a higher chain of command, in an attempt to clear himself of his own wrongs. Then, when Mr. Hardy informed him that he was going to seek civil remedies against him for his deliberate indifference, he stated to Mr. Hardy, "Fuck your lawsuit, I have immunity." This statement clearly describes defendant Rabie's state of mind when having contact with inmates. He is operating under an absurd assumption that it is okay to intentionally violate clearly established law, and the constitutional rights of an inmate, simply because he works in law enforcement, and believes his acts

4 (P-2)

or omissions are cloaked by qualified immunity.

52. Despite declaring a medical emergency a second time within a couple of hours apart, once with defendant Rabie, and a second time with deputy Chavez and nurse Doreen, deputy Chavez told Mr. Blandy that he would have to wait for his emergency care until after he finished passing out medication. Nurse Doreen then chimed in and stated "we cannot send him down to medical because "Amanda" is down there, and it wont be good for him". Deputy Chavez then answered: "oh yeah, I forgot". We now have an issue where Mr. Blandy is being denied his emergency medical request because Adams County Detention Staff and a nurse colleague to "Amanda" dont believe it to be safe for Mr. Blandy to be examined by her because of her prior gatekeeper failures.

53. Deputy Chavez told Mr. Blandy, that the reason defendant DeHerrera did not respond to the

4 (Q-2)

emergency response button was because the living unit staff created their own policy in the form of a wide spread practice "to intentionally ignore the emergency call buttons, because there are inmates who abuse the buttons, and staff does not want to spend the entire shift chasing buttons." Despite staff's ostensible attempt to avoid answering the meaningless questions from those inmates who may abuse the buttons, that is not a justification to ignore the specific intent and purpose for which the button was installed, which was to allow an inmate to call for help in the event of an emergency. Thus, the intentional disregard for an inmates emergency distress button is the equivalent of delaying or denying medical care for an incarcerated inmate, which is a violation of clearly established law, and an inmates constitutional right to medical care while incarcerated. In turn, the approval of

4 (r-2)

Such a policy by defendant Reigenborn would violate clearly established law and is the driving force behind Mr. blardy being deprived of his right to medical care.

54. The reason there is no follow-up care for Mr. blardy's September 22, 2022 fall, is because Mr. blardy was advised that he was in for a referral to see a doctor for his injury, after X-Rays were taken, but the gatekeeper for that obviously dropped the ball, because Mr. blardy was transferred to the CDOC, before the referral ever materialized.

CONCLUSION

55. This is a case in which Adams County had Eighteen covid based contagions as actual or constructive notice, that number 19 was on the way, just as 20 and 21 are almost sure to show their

4 (s-2)

faces in the future. Despite having actual or constructive notice of the coming COVID-19, policy failures and Adam County's deliberate indifference to the known or obvious consequences of their acts or failures to act, presented a tenebrous legal conundrum that carried with it a great probability of constitutional repercussions. Courthouse closures and jury trial suspensions brought on a procedural dilemma that could not be normalized by remote or virtual means, standing alone. The COVID-19 sparked fear across our nation, from regressive propaganda that may or may not have been defacto intentional in order to dissuade social contact and promote the use of electronic communication. In any event, Adams County lacked policies, customs or practices that would keep its criminal justice system operating in a lawful manner, while at the same time operating with constitutional dignity toward the protection of those being

4 (+-2)

detained in its Municipal Detention Facility, who have a clearly established right to be protected by the persons restricting them of their liberty.

56. Adams County and its Criminal Justice Army Joined forces, comprised of the Municipality itself, its Law Enforcement Sheriff, and his two Agencies; the Office of the Public Defender; The Office of Alternate Defense Counsel; The Office of the District Attorney; and the District Judges of the 17th Judicial District, and designed a plot plan or Scheme, that they knew, or reasonably should have known, violated clearly established law, and the Constitutional rights of every Adams County inmate who was represented by Court appointed Counsel.[8]

---

8. While these facts and matters pertain exclusively to Hardy v. Ring, 22-CV-01666-LTB, they are the underlying cause of Mr. Hardy's First, Second and Fourth Claims herein.

57. When Mr. Hardy brought unity to the inmate population inside the ACDF, and staged a lawful First Amendment Challenge to their misconduct, Adams County Weaponized its Municipal Sheriff, Richard Reigenborn, who acted deliberately indifferent to State and Federal law, by intentionally falsifying training and qualifications regarding his law enforcement Certification, and was elected Sheriff in violation of Clearly established law. Defendant Reigenborn has frequently been subject to suit in this Court, and has already proven, by history, his propensity for acts of retaliation against those who oppose him. See Coats V Adams County Sheriff's Office, 631 F. Supp. 3d 976 (U.S. Dist Colo 2022) and Coats V. Reigenborn, 2023 U.S. App. Lexis 27456 (10th Cir. 2023). The instant Case is simply another instance of his Specific intent to violate the Constitutional rights of those with whom he Comes into contact. As a final

4 (v-2)

policy maker for Adams County, he promulgated, created, implemented or possessed responsibility for the continued operation of a "use of force" policy, custom or practice that was used against Mr. Hardy in an effort to force him to succumb to an unlawful municipal agenda as proffered herein. This unlawful policy custom or practice was the cause and driving force behind Mr. Hardy being brutally assaulted by the two unknown masked Adams County Deputies, subjecting him to an unlawful "use of excessive force". Not only did Adams County fail to protect Mr. Hardy from this unconstitutional display of force, Adams County was the direct cause and encouragement that compelled the two unknown masked deputies to violate Mr. Hardy's Constitutional rights.

58. Defendant Reigenborn personally promulgated, created, implemented or possessed responsibility for the continued operation of a policy, custom or practice

4 (w-2)

that authorized the denial or delay of medical care for inmates who would be able to present a viable claim for relief in a court of competent jurisdiction. Not only has defendant Reigenborn authorized his subordinate deputies to delay or deny medical care for inmates that have been intentionally harmed, he has encouraged and demanded this unconstitutional misconduct, to prevent medical evidence from being available, that would subject him and his staff, and Adams County, to criminal and civil liability.

59. In an effort to punish Mr. Hardy, in retaliation for seeking civil redress in this court, Adams County and Richard Reigenborn changed municipal and ACDF policy to prevent Mr. Hardy from living in the only ADA compliant living unit, per his custody level. Mr. Hardy was threatened by Adams County Detectives and a deputy, not to file Hardy v. Ring et.al. in the Federal court. Mr. Hardy

4 (x-2)

was warned by these law Enforcement officials, that if he filed his lawsuit his future stay in the ACDF would be made less comfortable.

60  Defendant Reigenborn directed his deputies to place Mr. Hardy in a living unit that would isolate him from the inmates he was helping with their own Civil Rights complaints. Defendant Reigenborn directed his Staff to keep Mr. Hardy locked in his Cell while the rest of General Population was out using phones and watching Television. He directed his Staff to place arbitrary restrictions on the use of the ADA portable law kiosk, by Mr. Hardy, by Claiming it was out-of-order, or they had no time to go get it, or have it brought to the Pod. He directed his Staff to move Mr. Hardy into an environment that he knew posed a daily risk of harm to Mr. Hardy's personal safety. In that regard, Mr. Hardy was in a Wheelchair and unable to Safely use the Shower, toilet or Sink in his living unit,

4 (4-2)

due to barriers that prevented safe wheelchair access. He directed his staff to deny Mr. blandy's request for a move to a cell inside the same living unit where there was a handicap handrail already installed, The result of which caused Mr. blandy to fall from his wheelchair that resulted in Mr. blandy laying in the floor of his cell, immobalized for over 90 minutes, and in extreme pain, soaked in his own urine, and further injured by his cell-mate who was only trying to help.

61. Adams County was deliberately indifferent to a need for alternate accommodations for Mr. blandy's disability needs, in the unsafe living unit. Adams County knew of and disregarded the known risk of harm Mr. blandy faced in a non-ADA compliant living unit without alternate accommodations. Adams County was deliberately indifferent to the known or obvious consequences of its act of not owning or having

4 (2-2)

ready on hand, alternate accommodations to fit the disability needs of its disabled inmates, and its failure to act in providing those necessary accommodations, which resulted in Constitutional harm

61. Defendant Reigenborn directed his staff to cause Mr. Hardy's conditions of confinement to be constitutionally intolerable and unsafe, which they did at his command

63 Defendant Detterrera knew of and disregarded the specific intent and purpose of the in-cell emergency distress button. He knew of and disregarded the known or obvious consequences of his actions to intentionally disregard an emergency distress call from Mr. Hardy's cell, and that his failure to act would result in Mr. Hardy being deprived of needed medical care for a serious injury, in violation of Mr. Hardy's clearly established right to medical care.

4(a-3)

64. Defendant Rabie had visual and verbal confirmation that Mr. Hardy was injured and in pain. He knew of and disregarded Mr. Hardy's direct request for emergency medical care. He acted deliberately indifferent to Mr. Hardy's serious medical needs by closing the cell door in Mr. Hardy's face and telling him to file a grievance in order to obtain his needed emergency medical care which deprived Mr. Hardy of clearly established right to be free from cruel and unusual punishment.

65. Mr. Hardy demands a jury trial on all issues so triable.

4 (b-3)

1.    **E.    PREVIOUS LAWSUITS**

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated?  __X__ Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form.  If you have filed more than one previous lawsuit, use additional paper to provide the requested information for each previous lawsuit.  Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

Name(s) of defendant(s):            Adams County et.al.

Docket number and court:            U.S. District Court (Colo.) 22-CV-01666-LTB

Claims raised:                Violation of Rights Resulting in an unlawful/ Unconstitutional Conviction and Sentence

Disposition: (is the case still pending?
has it been dismissed?; was relief granted?)    Case was placed in a "Younger" Abstention

Reasons for dismissal, if dismissed:        N/A

Result on appeal, if appealed:            N/A


**F.    ADMINISTRATIVE REMEDIES**

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal court regarding prison conditions.  See 42 U.S.C. § 1997e(a).  Your case may be dismissed or judgment entered against you if you have not exhausted administrative remedies.*

Is there a formal grievance procedure at the institution in which you are confined?

        __X__ Yes ___ No (*check one*)

Did you exhaust administrative remedies?

        __X__ Yes ___ No (*check one*)

Original form provided free of Charge by CO DOC Legal Services to
5  Offender Hardy            DOC# 110262
Date JUN 0 5 2024

**G.** **REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF."*

1. **Enter Judgment in favor of the Plaintiff and against the Defendants.**

2. **Grant and order defendants to pay Compensatory Damages according to law.**

3. **Grant and order defendants to pay Punitive and/or Exemplary Damages according to law, for their intentional, malicious and wanton acts or omissions.**

4. **Order Defendants to pay all costs and fees associated with the filing and prosecution of the claims raised herein.**

5. **Grant any such other and further relief this court deems just and proper**

**H.** **PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____
(Plaintiff's signature)

_____
06/05/24
(Date)

(Revised November 2022)

Original form provided free of charge by CO DOC Legal Services to
Offender _Hardy_ DOC# _110262_
Date JUN 0 5 2024

Ralph M. Dandy 10262
Trinidad Correctional Facility
21000 Hwy 350 East
Model, Co 81059

United States District Court
(Colorado)

901 19th St. Room A-105

Denver, Colorado

80294-3589

Legal Mail

22-CV-02843-MDB-WJM

